O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSJ PEP TENNESSE LLC, | Case No. CV 14-03741 DDP (MANx) |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| v. | [Dkt. Nos. 6 & 9] |
| KAMALA D. HARRIS, CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; RONALD CHAPMAN; CALIFORNIA HIGHWAY PATROL; JOSEPH A. FARROW; OFFICE OF THE ATTORNEY GENERAL, CALIFORNIA DEPARTMENT OF JUSTICE, | |
| Defendants. | |

Presently before the Court are two motions to dismiss and/or strike portions of Plaintiff's First Amended Complaint ("FAC") in this case, from two groups of Defendants. Defendants California Department of Public Health ("CDPH") and Dr. Ron Chapman's motion to dismiss focuses primarily on the contract and property issues at play in this case, while Defendants California Highway Patrol ("CHP"), Office of the Attorney General ("OAG"), Joseph A. Farrow, and Kamala D. Harris's motion focuses on issues of unlawful seizure. Because the factual and legal questions involved in these

two sets of claims are mixed, the Court considers the two motions together.

**I.   BACKGROUND**

In 2010, CDPH purchased 13.7 million respirator masks, worth $9.8 million, from a company named Global Protection USA, Inc. ("GPI"). (Ex. 1, FAC.) Plaintiff alleges that after the purchase, CDPH requested that GPI store the masks for approximately two months. (FAC, ¶¶ 16-17.) However, after the two month period was over, CDPH did not retrieve the masks. Instead, they remained warehoused at GPI's facility for approximately two years. (Id. at ¶ 18.) Plaintiff alleges that GPI because to bill CDPH for storage, and that CDPH in some way "acknowledged that it owed the storage fees." (Id. at ¶ 19.) However, Plaintiff alleges, CDPH never actually paid these storage fees, which eventually totaled some $761,100.00. (Id. at ¶¶ 20-21.)

GPI, for apparently unrelated reasons, filed for Chapter 11 bankruptcy in March 2012. (Id. at ¶ 21.) As part of the bankruptcy proceeding, GPI obtained permission of the bankruptcy court to sell its "rights and claims against the California Department of Public Health . . . arising from the storage of CDPH's 3M masks/respirators" to a company called Global Safety. The sale took place on or around September 24, 2012. (Ex. 3, FAC.) At around the same time, GPI was pursuing administrative relief against CDPH through the California Victim Compensation and Government Claims Board ("VCCB"); that relief was summarily denied on December 7, 2012. (Id. at ¶ 21.)

While the claim was pending with VCCB, Global Safety began negotiating to sell the masks themselves, to Leslee Sports,

2

apparently in the belief that GPI had held a "warehouseman's lien" on the masks to secure payment of the storage fees. (Id. at ¶¶ 20, 23.) Global Safety transferred its interest in the claim to Rhino Pets Series 1, LLC, which in turn sold the masks to Leslee Sports. "During negotiations for that sale, Rhino . . . represented that CDPH could no longer assert any ownership claim to the Masks and that Leslee could take ownership free and clear together with a claim for unpaid storage fees." (Id. at ¶ 25.) On December 14, 2012, Leslie sold "all of its rights and title to the masks" to Plaintiff. (Id. at ¶ 27.)

At some point in this process, the masks had been transferred to the care of a "third party warehouse in Los Angeles" belonging to American Export Lines ("American Export"). (Id. at ¶ 29; Ex. 6, FAC.) On February 13, 2013, CDPH sent a letter to the warehouse agent claiming that the masks had been "converted" by Plaintiff's predecessors in interest and demanding their prompt return. (Ex. 6, FAC.) Plaintiff alleges that around February 20-24, American Export, its attorney, an attorney from OAG, a CHP officer, and other unidentified parties held a telephone conference, during which the CHP and OAG representatives told American Export that the masks were "stolen goods" and that the state would "shut down" American Export's operations if it was forced to obtain a court order to get the masks. (Ex. 7, FAC.) American Export thereafter turned the masks over to some state agent. (Id.)

Plaintiff therefore presents claims against CDPH for breach of express, implied, or quasi-contract for failure to pay the fees; against CDPH and CHP for conversion and trespass to chattels; against CDPH, CHP, and OAG for violation of a statute prohibiting

3

the use of violence or intimidation; against Ron Chapman, Kamala Harris, and Joseph Farrow individually for deprivation of Fourteenth Amendment due process rights, as well as unlawful seizure under the Fourth and Fourteenth Amendments, per 42 U.S.C. § 1983; against CDPH, CHP, and OAG for violations of the California Constitution; and for a declaratory judgment regarding "the rights and responsibilities of the parties arising from their ownership interests, if any, in the Masks." (FAC ¶¶ 39-123.)

Plaintiff requests compensatory and punitive damages, costs, attorneys' fees, prejudgment interest, declaratory judgment, and either an order directing the return of the masks to Plaintiff or an order directing Defendants to provide Plaintiff an appealable hearing on CDPH's interest in the masks.

## II. LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(6) only if it "either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." Williams v. Gerber Products Co., 552 F.3d 934, 937 (9th Cir. 2008). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

///
///
///

## III. DISCUSSION

### A.  Storage Contract and Warehouseman's Lien

At the heart of this case is the question of what rights, if any, Plaintiff acquired from its predecessors in interest. Plaintiff asserts that GPI had, at the time of its bankruptcy, a storage contract with CDPH: either an express/implied-in-fact contract, a modification of the original purchase order, or, at the very least, an equitable quasi-contract based on GPI's reasonable reliance on CDPH's representations that it would pay storage fees. (FAC ¶¶ 39-72.)  Relatedly, Plaintiff asserts that GPI acquired, as the warehouser of CDPH's goods, a warehouseman's lien on the masks to secure payment of the storage fees.  Alternatively, Plaintiff argues, CDPH affirmatively abandoned the masks, which would also allow GPI and its successors to claim ownership.  Thus, under this theory, CDPH owes Plaintiff either the storage fees or the masks.

Were CDPH a private party, Plaintiff's contentions would suffice to survive a motion to dismiss.  At the very least, resolving Plaintiff's claims would require a factual inquiry as to whether GPI made an offer of continuing storage and whether CDPH accepted the offer, either verbally or by continuing to store its masks with GPI.[1]  And if such a contractual agreement existed, GPI likely could have obtained a warehouseman's lien and the concomitant right to sell the masks.  Cal. Commercial Code §§ 7206, 7209-10.

---

[1] "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."  Cal. Civ. Code § 1584.

5

However, because CDPH is a public entity, the matter is different. As a general rule, public entities in California may not contract in any manner other than that prescribed by statute-usually by approval of the Department of General Services.

> *All* contracts entered into by any state agency for . . . services . . . or maintenance of property, real or personal . . . are void unless and until approved by the department. *Every contract* shall be transmitted with all papers, estimates, and recommendations concerning it to the department and, if approved by the department, shall be effective from the date of the approval.

Cal. Pub. Cont. Code § 10295 (emphases added). Plaintiff does not allege, even in its Opposition, that the purported contract was transmitted to or approved by the Department.

Of course, it is not necessarily the responsibility of a party suing a state agency to allege the details of internal communications of the state government. But in this case, where the entire contract would have arisen passively-"CDPH accepted GPI's offer of further storage . . . by maintaining the Masks at GPI's warehouse without objection" (FAC ¶ 43)-Plaintiff cannot rely on a presumption that the contract had gone through the proper channels. Because, absent a statutory exception,[2] Department

---

[2] Plaintiff notes that there are a few statutory exceptions to the general provision quoted above, see Cal.Gov.Code § 14616 (Director of General Services may exempt contracts under $50,000 from approval); Cal.Gov.Code § 11256 (Director may exempt service arrangement between state agencies). Plaintiff argues that "only discovery will reveal . . . whether and to what extent any of the myriad exceptions apply." (Opp'n at 24:6-9.) But § 10295, by including in its sweep "all" contracts, establishes a general presumption. Thus, to survive a motion to dismiss, Plaintiff must
(continued...)

6

approval is a statutory requirement for contract formation, and all other contracts are void as a matter of law, there could not have been a contract between GPI and CDPH.

Plaintiff nonetheless argues that some form of quasi-contract must apply to this situation. "Under Defendants' logic," Plaintiff avers, "by agreeing to store the masks for two months, GPI became forever obligated to hold the Masks for CDPH and had no means to collect payment or cause the state to recognize its obligation. That cannot be the law." (Opp'n at 25:25-27.)

That is not the law. Although in general quasi-contract cannot be found where the method of government contracting is established by statute, Reams v. Cooley, 171 Cal. 150, 156-57 (1915), in extreme circumstances, equitable remedies like promissory estoppel may be available. "The government may be bound by an equitable estoppel in the same manner as a private party when . . . the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." City of Long Beach v. Mansell, 3 Cal. 3d 462, 496-97 (1970).

Here, however, there is little in the way of injustice that will be wrought should the Court not apply estoppel. GPI was not "forever obligated to hold the Masks for CDPH." It could, for

---

[2](...continued)
allege at least some facts tending to show that some statutory exception applies. Mere hope that some such exception applies and that "discovery will reveal" the exception is not enough. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) (plaintiff must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of" the purported cause of action).

7

example, have picked up the phone and demanded that CDPH come collect its goods-a simple action that, surprisingly, is nowhere alleged by Plaintiff. If a direct request failed, GPI could have sought injunctive relief based on trespass. Cal. Gov't Code § 814 (excluding claims for injunctive relief from general provisions of government immunity). Instead, GPI decided to respond to CDPH's neglect by invoicing in the hope of collecting storage fees. That is understandable-had it worked, GPI might have been much the richer. But that is not how government contracts are formed, and GPI's gamble that it could collect storage fees without a valid contract does not compel the Court to set aside the important public policy considerations embodied in the statutory limitations placed on state agency contracting.[3]

Public policy considerations similarly counsel against finding that GPI had a warehouseman's lien, or that CDPH had abandoned the masks. It is well-established under California law that mechanic's and materialmen's liens cannot be asserted against public property, North Bay Const., Inc. v. City of Petaluma, 143 Cal.App.4th 552, 556 (2006), and CDPH argues that the same is true of warehouseman's liens. Plaintiff counters that the line of cases cited in North Bay apply only to liens on real property, not the sort of fungible personal property at issue here. But those cases consistently refer to "principles of sovereign immunity," id., and Plaintiff does not make a convincing argument as to why the warehouseman's

---

[3] "The statutory requirement of independent written approval of the Director of General Services protects the public from improvident or secret action . . . ." State of California v. Haslett Co., 45 Cal. App. 3d 252, 257 (1975).

8

lien statutes should be read to abrogate the general presumption of immunity.[4]

Plaintiff does argue that real estate is specially protected from liens because it is "irreplaceable," while the masks in question are "fungible." (Opp'n at 30:22,26.) But while they may be fungible in a technical sense, it is not necessarily the case that CDPH would be able to lay hands on 13.7 million such masks at a moment's notice in case of a public emergency. Indeed, that fact is presumably what motivated the agency to purchase these masks in advance of any such emergency. Although it certainly appears, on Plaintiff's facts, that the agency was negligent in taking possession of its property, that negligence did not entitle GPI to claim ownership of state property. See, e.g., United States v. Cardinale Warehousing Corp., 65 F. Supp. 760, 762 (D.N.J. 1946) (finding no warehouseman's lien against the federal government because "[i]t would be intolerable to imagine that the United States would not have the right at all times and under all circumstances to the possession of such materials purchased to promote the defense of the United States.") (internal quotation marks and ellipses omitted).

In short, absent specific statutory authorization, policy considerations and general principles of sovereign immunity counsel

---

[4] Plaintiff also cites no authority for its proposition. Plaintiff does cite to a sentence in In re S. Bay Expressway, L.P., but in context that sentence is clearly intended to distinguish between private and public property interests, not between mechanic's liens and other liens: "[North Bay] stands for the unremarkable proposition that mechanic's liens cannot be asserted against a public's entity's interest in *public property*. Here, the mechanic's liens are asserted against Debtors' *private property interests*, not the concurrent property interest of Caltrans." 434 B.R. 589, 601 (Bankr. S.D. Cal. 2010) (emphases added).

9

against finding that private parties can impose liens on personal property owned by the state government.

For similar reasons, a court cannot presume that long-unused government property has been abandoned, absent an "official action" affirmatively showing intent to abandon. City of Stockton v. Miles & Sons, Inc., 165 F. Supp. 554, 560 (N.D. Cal. 1958). The public interest in the government's retaining ownership of the people's property, even despite neglect by officials, is far too great to allow private parties to lay claim to supposedly "abandoned" items. This is why, for example, there is no right to adverse possession of public property. Cal. Civ. Code § 1007. "The public is not to lose its rights through the negligence of its agents . . . ." Bd. of Ed. of City & Cnty. of San Francisco v. Martin, 92 Cal. 209, 218 (1891).

Plaintiff argues that CDPH's failure to intervene or otherwise assert its rights in the masks during GPI's bankruptcy proceedings is an official action showing intent to abandon. But that argument must be rejected, as it relies on a failure to take action when it might have been prudent–i.e., negligence, which does not suffice to show intent to abandon. Plaintiff relies on City of Stockton, but in that case the city affirmatively showed its intent to abandon a water channel by filling it with soil, as well as taking certain other legislative steps to officially abandon the property. 165 F. Supp. at 560. Declining to intervene in a bankruptcy proceeding in New Jersey is not such an affirmative official action–especially

10

where it was unclear what, if any, rights were actually being transferred.[5]

The Court accordingly grants the motions to dismiss the first through fourth and seventh causes of action. Because the Court finds that neither GPI nor any of its successors in interest had any property right in the masks, this effectively also resolves the thirteenth cause of action, for declaratory judgment as to the parties' rights in the masks. The fifth cause of action (conversion) and sixth cause of action (trespass to chattels) rely on a property right in the masks which, as a matter of law, does not exist, and therefore the Court grants the motions to dismiss as to these claims as well.

**B.   Bane Act and Federal and State Constitutional Claims**

**1.   Bane Act**

Plaintiff asserts a claim under the Bane Act, Cal. Civ. Code § 52.1, which provides for damages and injunctive relief for an individual "whose exercise or enjoyment of rights secured by the Consitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with." The intimidation must be accomplished "by threats, intimidation, or coercion." Id. If the action is brought on the basis of speech alone, rather than intimidating or coercive *acts*, the plaintiff must show that "the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that,

---

[5] The Bankruptcy Court itself did not specify what the source of the property right in the masks might be: ". . . whether those claims arise under any warehouseman's lien, abandonment claims, statute, common law, or otherwise . . . ." (Ex. 3, FAC.)

11

because of the speech, violence will be committed against them or their property." Id. at §52.1(j).

Defendants primarily argue that Plaintiff cannot assert the Act's protection because any alleged threats were against the third party warehouse, not against Plaintiff, and because the state believed at the time of the alleged actions that Leslee Sports, not Plaintiff, was holding the masks. (CHP Defs.' Mot. Dismiss at 8-9; CHP Defs.' Reply at 11-13.) However, because the Court finds an independent reason to dismiss the claim on the face of the Bane Act statute, it need not reach that issue here.

Plaintiff alleges that, during a phone conversation, the Defendants threatened to shut down its third-party warehouser's business. This is not enough to satisfy § 52.1(j)'s threat-of-violence requirement. Even taking into account that the violence may be against "property," the plain meaning of the word "violence" clearly involves some physical, destructive act, which would not include administratively shutting down a business. A mere statement that an official may take official action is not a threat of violence. Martin v. Cnty. of San Diego, 650 F. Supp. 2d 1094, 1109 (S.D. Cal. 2009) ("Det. Maus told Plaintiff that if he did not consent to voluntarily submit a DNA sample he would attempt to get a warrant and 'come look[ing] for you.' Det. Maus did not threaten violence against Plaintiff. . . .") Plaintiff's allegation therefore cannot sustain a Bane Act claim. The motions to dismiss are granted as to this claim.

**2. Claims Under the California Constitution**

Plaintiff also brings two claims under different provisions of the California Constitution. First, Plaintiff alleges a violation

12

of Cal. Const. art. 1, § 7, which reads, in pertinent part, "A person may not be deprived of life, liberty, or property without due process of law . . . ." Parties are agreed that Plaintiff may not seek money damages for such a violation, and Plaintiff now seeks only injunctive relief. (Opp'n at 35:17-20.) However, the injunctive relief Plaintiff seeks is return of the masks, presumably in order to sell them or seek storage fees from CDPH. (FAC ¶ 115.) As the Court has now determined that, as a matter of law, the masks belong to the state and no storage fees are due, any claim for injunctive relief is moot. This claim is therefore dismissed.

Second, Plaintiff alleges a violation of Cal. Const. art. 1, § 13, which reads, in pertinent part, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated . . . ." Absent a claim under a statute like the Bane Act, Plaintiff essentially alleges a freestanding constitutional tort.

The California Supreme Court has laid out a test for determining whether such a tort exists. The court must first consider whether there is evidence of an affirmative intent to create such a tort; if so, the court gives effect to that intent. Katzberg v. Regents of Univ. of California, 29 Cal. 4th 300, 317 (2002). "But with regard to most constitutional provisions, the words of the provision do not on their own manifest any such intent." Id. Thus, the court must often look to historical context to determine whether such intent existed. Id. Only if no such intent can be found does the court proceed to a more free-ranging "constitutional tort analysis" modeled on the United States

13

Supreme Court case <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>. <u>Id.</u>

Federal courts in California have reached contradictory conclusions about whether such a tort based on § 13 actually exists. Those that have found a constitutional tort have generally done so based on an inference of intent on the part of the drafters of the California Constitution, relying on language in <u>Katzberg</u> suggesting that the tort remedy for unlawful searches and seizures is an ancient one incorporated into American law from the English common law. <u>Compare</u> <u>Wigfall v. City & Cnty. of San Francisco</u>, No. C 06-4968 VRW, 2007 WL 174434, at *1, *4-6 (N.D. Cal. Jan. 22, 2007) (undertaking the <u>Katzberg</u> analysis and concluding that no tort remedy exists), <u>with</u> <u>Millender v. Cnty. of Los Angeles</u>, No. CV 05-2298 DDP RZX, 2007 WL 7589200 at *1, *39 (C.D. Cal. Mar. 15, 2007) <u>rev'd in part</u>, 472 F. App'x 627 (9th Cir. 2012) (finding that <u>Katzberg</u> implied a historical foundation for tort remedy for unlawful searches and seizures), <u>and</u> <u>Smith v. County of Riverside</u>, No. EDCV 05-00512 VAP, at *1, *16-18 (C.D.Cal. May 16, 2006) (same). The Court finds the <u>Millender</u>/<u>Smith</u> reasoning more persuasive.

Defendants argue that <u>Katzberg</u>'s discussion of a New York case describing the historical tort remedy for unlawful search and seizure[6] was meant only by way of example and is limited to the specifics of New York law: "[T]he New York court found historical support in New York case law and legislative history for New York's adoption of a damages remedy . . . . [But] the court in Wigfall

---

[6] <u>Brown v. State</u>, 89 N.Y.2d 172 (1996).

14

found that an analysis of California legislative history did not show support." (CHP Defs.' Mot. Dismiss at 15:9-17.)

But the <u>Katzberg</u> court in fact appears to have been pointing to a general understanding that where a state constitution is adopted that preserves the common law, it is appropriate for courts to infer the existence of "constitutional torts" based on historical tort remedies for the wrongs contemplated by specific constitutional provisions:

> In considering evidence of an implied right to seek damages, we also believe it appropriate to examine, as have sister state jurisdictions that have permitted damage suits to remedy search and seizure violations, common law history from which we might infer, within the provision at issue, an intent to provide an action for damages to remedy a violation of that provision . . . .
>
> [T]he New York Court of Appeals observed that 'the courts have looked to the common-law antecedents of the constitutional provision to discover whether a damage remedy may be implied. New York's first Constitution in 1777 recognized and adopted the existing common law of England and each succeeding Constitution has continued that practice . . . .'

<u>Katzberg</u>, 29 Cal. 4th at 322.

The California Constitution, like the New York Constitution, appears to have been drafted against a background expectation that common law remedies would continue to be available. Indeed, shortly after the adoption of the Constitution, California affirmed by statute that "[t]he Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United

15

States, or the Constitution or laws of the State of California, shall be the rule of decision in all the Courts of this State." Cal. Stats. 1850, ch. 95.[7] And as the Katzberg court noted, the English common law, by longstanding practice, provided a damages remedy for unlawful searches and seizures. Id. Thus it seems quite likely that the framers of the California Constitution expected and intended that violations of § 13 would have had a common law tort remedy.

In the absence of an actual California Supreme Court decision, this Court "must predict how the California Supreme Court would decide the issue" and rule accordingly. Astaire v. Best Film & Video Corp., 116 F.3d 1297, 1300 (9th Cir. 1997). There is no California Supreme Court case ruling conclusively on this issue. Therefore, the Court, following the analytic pattern set forth by Katzberg, finds that Plaintiff can claim damages for a violation of § 13.

Defendants' motions to dismiss are therefore denied as to this claim.

**3. Claims Under 42 U.S.C. § 1983 for Violations of the Federal Constitution**

Finally, Plaintiff alleges that Defendants violated the Fourth and Fourteenth Amendments of the United States Constitution by seizing the masks, and it brings a claim for damages under 42 U.S.C. § 1983. The seizure itself was unlawful, Plaintiff argues, and it was also deprivation of property without due process of law. Defendants argue that these claims "fail to state plausible claims

---

[7] The statute is today codified, with small changes, at Cal. Civ. Code **§** 22.2.

16

on which relief may be granted because, as a matter of law, Plaintiff had no lawful right to possession or ownership of the property that it claims was unlawfully seized by the Defendants." (CHP Defs.' Mot. Dismiss at 2:14-20.)

But Plaintiff's claim on the masks had not yet been adjudicated at the time of seizure. It had a non-frivolous, if ultimately unavailing, legal argument for a lien and the right to hold or sell the masks to recoup storage costs.[8] No court had yet determined that Plaintiff "had no lawful right to possession" of the masks.

Where property rights are disputed or imperfect, at the very least a party is entitled to appropriate due process before the property is seized. As the Supreme Court has explained in the context of the use of replevin by private parties:

> The right to a prior hearing, of course, attaches only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection . . . .
>
> The appellants who signed conditional sales contracts lacked full legal title to the replevied goods. The Fourteenth Amendment's protection of 'property,' however, *has never been interpreted to safeguard only the rights of undisputed ownership*. Rather, it has been read broadly to extend protection to 'any significant property interest . . . .'

---

[8] In particular, it appears that no previous court has taken up the question of whether a private party can obtain a warehouseman's lien and right of sale against the state's fungible personal property under Cal. Commercial Code § 7206(a). As Plaintiff points out, the lien and right to sell are available under § 7206(a) even in the absence of any contractual obligation.

17

> The appellants were deprived of such an interest in the replevied goods—the interest in continued possession and use of the goods . . . .
>
> Their ultimate right to continued possession was, of course, in dispute. If it were shown at a hearing that the appellants had defaulted on their contractual obligations, it might well be that the sellers of the goods would be entitled to repossession. But . . . *[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing.*

Fuentes v. Shevin, 407 U.S. 67, 84 (1972) (emphases added).

Nor does the right to be heard depend on whether the adverse claimant is the state. Although case law is sparse on this particular point, courts have been reluctant to deny private parties due process in property disputes solely because the other party is the government. See Langbord v. U.S. Dep't of Treasury, 645 F. Supp. 2d 381, 396 (E.D. Pa. 2009) (holding that due process requirements applied when government seized coins that were the subject of an ownership dispute with a private party); United States v. One Parcel of Real Prop. with Bldgs., Appurtenances & Known as 170 Westfield Drive, Located in the Town of E. Greenwich, Rhode Island, 34 F. Supp. 2d 107, 115 (D.R.I. 1999) (declining, where the government had seized disputed property, to find that the adverse private claimant had merely held the property in constructive trust).

Similarly, the Fourth Amendment protects against unlawful searches and seizures even when title to the property is unclear, and even when the adverse claimant is the government.

> The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be "unreasonable" within the Fourth Amendment *even though the Government asserts a superior property interest* at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts.

Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 304 (1967) (emphasis added). See also Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994) ("The district court concluded no constitutional violation had occurred because the [police department] owned the dog at the time the animal was taken from the Leshers' home. Regardless of the disputed ownership of this dog, the court erred in dismissing the Leshers' Fourth Amendment claim.").

In short, both the guarantee of due process of law under the Fourteenth Amendment and the protection from unreasonable seizure under the Fourth Amendment apply to seizures of property held by a private party to which the government asserts a claim.

As the Defendants offer no other grounds for dismissal of these claims, the motions to dismiss are denied as to the § 1983 claims.

///
///
///

19

**IV. CONCLUSION**

    The motions are granted and Plaintiff's First Amended Complaint is dismissed as to its First through Eighth, Eleventh, and Thirteenth Causes of Action. However, the motions are denied as to the Ninth, Tenth, and Twelfth Causes of Action.

IT IS SO ORDERED.

Dated: October 7, 2014

                                                    DEAN D. PREGERSON
                                                    United States District Judge